Good morning, and may it please the Court, I am James Laughlin, and I represent the appellant Mariano Martinez. For the Court's permission, I would like to reserve four minutes of my time for rebuttal. Although I will gladly answer any of the Court's questions about any of the issues raised by Mr. Martinez, I would like to spend the bulk of my time talking about his Brady claim. There is no dispute that the Governor's— You're going to spend the bulk of your time on what? The Brady claim, Your Honor. But of course, I'm willing to answer any questions the Court has on any other issue as well. There's no dispute that the Government had the cell phone records at issue and didn't turn them over to the defense until after Mr. Martinez's trial. So the only dispute at issue here is materiality. Whether there is a reasonable probability that had the evidence been disclosed to the defense, the results of the proceedings would have been different. Or to put it another way, the question is, does the fact that these records were suppressed undermine confidence in the outcome of Mr. Martinez's trial? Obviously, the significance of the suppressed record must be balanced against the other evidence presented at trial. And for that reason, I'd like to put aside the cell phone records for a minute and talk about the case that the Government had against Mr. Martinez and to show how weak it really was. Now, the Government takes the position that this case was solid as a rock. But significantly, it completely ignores the most obvious evidence to the contrary. And that is the fact that all of Mr. Martinez's alleged co-conspirators in the American performance shootings were acquitted in a subsequent trial. The Government doesn't dispute that jurors in that trial substantially the same evidence that Mr. Martinez's jury heard. And they didn't think that it was sufficient to return guilty to their verdicts. This demonstrates that the Government's case was tenuous at best and that any relevant exculpatory evidence would have made a difference in Mr. Martinez's case. Even putting aside the subsequent acquittals, there were numerous problems with the Government's case against Mr. Martinez. Those problems are fully covered in the briefs, and I'm not going to repeat them all here. But there are two things that I would like to address because there's things the Government has never responded to. And maybe the Government will take the opportunity this morning to do that. First is that the testimony of Max Travisco, the Government's star witness, conflicted in serious parts with the testimony of Ron Moreno, the owner of American Performance Auto Shop, who was an eyewitness. Mr. Moreno testified that he saw a Chevy Astro van leaving the scene of the crime. But when he was shown a picture of the van owned by Marsal Arrealo, the van Travisco said was used to drop off the shooters, Mr. Moreno, a man with over 20 years of automotive experience, said that that was not the van he saw on November 19th. House, was this evidence presented to the jury? Yes. So the jury was given the opportunity to decide which of the witnesses was more credible and what evidence to believe? That's true, Your Honor. And the reason I'm doing this now is I want to show you how flimsy the Government's evidence was. And then when we get to the suppressed cell phone records, it will be obvious why they would have made a difference. Because the Government's whole case, they don't like to acknowledge it, but the Government's whole case rested on Max Travisco and his credibility. So any time a witness who has no axe to grind, no reason to lie, comes up with a story that is so different from Max Travisco's story, it severely undercuts his credibility. So it's your position that the Government's whole case rested on that one witness? Yes. And I'll explain why. Well, actually, that witness and then there's the other witness, Rochin, another Mexican mafia associate who became a government cooperator, who said, Mariana Martinez visited me 20 days after the shootings and said we did murders in Montebello. I addressed that in the briefs. Even the FBI agent said, you know, I don't remember him telling me this before. So he kind of made up much after the fact. So I don't, that's the only thing not linked to Max Travisco. And I don't, and keep in mind, that witness also testified in the third trial where all of the co-defendants were acquitted as well. So you're discounting the informant's testimony? Yes. And as I explained, they were both testifying to avoid what would definitely be long, if not lifetime, terms in prison and because they were both fearful of the death penalty. So that gives, you know, even the strongest witnesses a very serious motive to lie. The other thing the government never asked the eyewitnesses to the crime to identify Castillo and Giacobbo, the two people who, according to Travisco, did the shootings. The police showed these eyewitnesses photo spreads of other suspects early in the investigation. But once Travisco told the government that Castillo and Giacobbo were the shooters, it apparently never bothered to show them pictures of Giacobbo and Castillo to see if they could identify the shooters. And when these witnesses took the stand, the government never asked them to ID those two men as the shooters. And I think that raises the question, why not? If the government was so firm in its belief in Travisco's story, why didn't it pull out the pictures and say, are either one of these people the people you saw shooting up American performance? Maybe the government will answer that question this morning. Now, the government claims that this case didn't rest, again, solely on Max or Kat phone calls. And I explained that these calls are made in code, meaning that they require Travisco's interpretations to make the government case. The government argues only some of these conversations are in code, and some of them aren't. But I think the court is the best person that can make that determination itself. I suggest to the court that if it goes and looks at each one of those tape-recorded conversations and forgets about any other information it has, there is no way, based solely on the language used in those conversations, that anyone can say that they were talking about Richard Serrano or shooting up American performance. I want to make one thing clear, though. I'm not saying that those conversations don't sound incriminating. Clearly, the participants were talking about something illicit. That's why they were talking in this kind of code language. If you believe the government, these men were all part of the Mexican mafia, and they engaged in illicit activity daily. And so, the fact that there's something fishy going on isn't enough. They have to show that these conversations related to the plan to kill Richard Serrano and the shooting up of American performance. And without Travisco's... Aren't you asking us to segment the evidence in a way that the evidence is not presented at trial? You're asking us to isolate each segment of the evidence. Is that appropriate for us to do? I don't understand the court's question about how I'm asking to say. I'm going through sequentially... Only to consider this, only to consider that, only to consider Travisco's testimony, then only to consider the intercepted phone calls. Is that what you're asking us to do, to look at each piece of evidence separately? Not exactly. I'm going through them sequentially, but obviously the court looks at them as a whole, and the weaknesses kind of compound on each other. I don't think that the government would dispute that when it comes to the American performance shootings, putting aside the evidence that was presented later in the trial about the forensic type of evidence, showing where people were when they got shot, which didn't really go to who did the shooting. The evidence about who did the shooting came from Travisco's state testimony about a bunch of unrecorded meetings, and that's where all the significant stuff really happened, these unrecorded meetings that we only have his word about. These tape-recorded phone calls, which I've explained, do not implicate anybody in this crime unless you have Travisco interpreting them saying, oh, when we said Wes Covina, that's a code name for Richard Serrano, things of that sort. So, again, he's linked to that. The third thing that they had was the eyewitnesses who were at the scene of the crime, and I pointed out that their testimony is not only inconsistent, it doesn't help the government's case, it's inconsistent with Travisco's testimony. I explained about the van that Ron Moreno saw. Ron Moreno also said that he knows that wasn't the van, he knows Arivala's van wasn't the van that was casing a shop and came on that day, because he'd seen that van several times before in the days preceding, and in fact, one time a guy got out of that van who made Serrano nervous, and there is no way that can be reconciled with the rest of Travisco's testimony, where he says that the only reason we went to shoot Richard Serrano on that day is because he happened to pop up in City Terrace and we followed him to American Performance. So that, Your Honor, I believe is in a nutshell, that's all the evidence, and I've tried to go through and explain the problems with each of the evidence, but that's it, that's all they got, and I think that this Court should seriously consider that the government has not disputed that it didn't present that same evidence to the third jury that then acquitted every other single alleged participant in this American Performance shooting. That gives this Court the evidence much better than it typically has when it has to make this kind of call about how weak the government's case was. So now I'd like to turn to the cell phone records to show you how they were exculpatory and they were false. And more importantly, how they showed that Travisco's story was a lie. Travisco's testified that he had multiple conversations with Martinez, Arivalo, Castillo, and Jacobo, in which they explained to him exactly what happened on the day of the afternoon of November 19th. And he then repeated that to the jury. Travisco said that, quote, they were just waiting for the okay for the jury to interpret Travisco's testimony. It admits in its appellate brief that it asked the jury to infer that Mr. Martinez was within walkie-talkie range of American Performance all the way up until the time of the shootings. And it also concedes that this inference is no longer plausible in light of the suppressed records. It nevertheless claims that the suppressed records are not material because they confer a new theory that is consistent with these records, namely that Mr. Martinez gave the order over the walkie-talkie but told the shooters to wait 10 or 20 minutes or so so he'd get out of the area first. I have three responses to that. First, I think this Court should find that Brady documents like these that require the government to change its theory of the case cannot be immaterial. I could find no case law that addresses this particular issue, but I think that notions of fundamental fairness prohibit the Court from affirming a conviction under such circumstances based on what a jury might have done if it had presented with a government's new and different theory. If the government wants to retry a new theory, let it present it to a new jury at a new trial. Second, the government's new theory is difficult to reconcile with in detail what happened at American Performance. It's implausible that he would not have known if Mr. Martinez had issued a delay order to give himself an alibi in time to get out of the area, and if Tarvisco had known about it, he would have testified about it. Third, the government has apparently already presented its new theory to a jury in the trial of Mr. Martinez's alleged coke conspirators. The color map that appears in the appendix to the reply brief, this map was the one used in the third trial, and this map, the red numbers C1 through C10 represent the Martinez's cell phone calls from the suppressed cell phone records that weren't available in Martinez's records. This is what they presented to that jury, the jury that did everybody of the American Performance shootings. The facts of the suppressed records conflict with Tarvisco's theory enough to undermine confidence in the outcome of Mr. Martinez's trial, but the suppressed records are also significant for two other reasons. First, the records show that the meeting described by Tarvisco where Mr. Martinez supposedly came to see him at his house on the afternoon of November 19th could not have happened. This meeting was important because it was during this unrecorded conversation that supposedly Mr. Martinez explicitly told Tarvisco he was on the move. The cell phone records show that Mr. Martinez was on the move all that afternoon, and the one time he was in the same area long enough to have any sort of meeting, it was not in the area where Tarvisco lived. Second, the records also show that on November 18th, the day before the shootings, Mr. Martinez was traveling around the same general area he was on in November 19th. Specifically, it shows he was within a mile of American Performance at 430 that afternoon. This is significant because it shows there was nothing unusual about Martinez being in that same area on 450 that afternoon. And that is significant because the government, particularly with its new theory which places Martinez's location to American Performance farther back, is making a big deal about him being in that area, him hanging around that area. That's where he lived, as we point out in the briefs. His girlfriend lived there. He owned a store there. That's where he lived. Nothing unusual about him being there, and these records would have clarified that and emphasized that fact to the jury. Is it just the two days' records that were held out, the 18th and 19th? It was about days and a half. I believe that the records for the 18th start about noon. I don't think we have the full day for the 18th. In light of all this, the suppressed records were clearly material and, at a minimum, requires the court to reverse the counts related to the American Performance shootings. But actually, the government's Brady violation tainted the entire trial, and so all of Mr. Martinez's convictions should be reversed. First of all, the new evidence would have had a domino effect on Torvisco's credibility. Once it was shown that the American Performance shootings could not have happened as Torvisco described, the jury would have had to disregard or at least seriously question the other testimony he gave, and he did offer testimony as to every single count. Second, the American Performance murders were of a nature likely to emotionally inflame the jury so that they could not have been segregated by the jury in considering the other charges. The government claims that this is not the case because Mr. Martinez was charged with other violent crimes, but the fact is the only murders charged in the indictment occurred at American Performance, and those crimes involved the only non-gang related victims. Clearly, the government thought that these crimes were far worse than the other charges in the indictment. After all, it was the American Performance murders that the government pointed to as justification for imposing the death penalty against Mr. Martinez. If this doesn't send a message to the jurors that these crimes are far more heinous than those others, I don't know what does. Therefore, because the government's Brady violation affected Mr. Martinez's entire trial, all of his I'm seeing I'm into my rebuttal time, so unless the Court has any further questions, I've reserved the remainder. That's fine. Thank you. Thank you. May it please the Court. I'm Robert Dugdale, and I represent the United States of America in this case. The defendant alleges that the, that he's entitled to a new trial based upon the government's inadvertent failure to turn over cell site records that show his whereabouts on the day of November 19th, 1998, the date of the triple homicide in Montebello. The defendant raised his claim in a motion for a new trial before Judge Carter, and after a two-day hearing in which Judge Carter considered this and defendants' other claims, he rejected this specific Brady claim, finding, first of all, that these cell site records were not exculpatory or impeaching. In fact, they were helpful for the of them did not need to test for materiality required under Brady. Namely, they did not put the case in such a different light as to undermine confidence in the verdict. Counsel, what about opposing counsel's, in that, that the government had to change its theory of the case after the new cell phone records came to light? Well, it, it's true that in the third trial that, that the records were there, so clearly the theory couldn't be that Martinez was there all the way up in time, to the time of the murder. But the third trial didn't involve the defendant, it involved the other defendants. The thing that's the difference between the third trial and the second trial is, of course, the defendant, and the role that he played, and the evidence was not the same, and the case presented was not substantially the same. And that- But in terms of cell phone records, the theory in Mr. Martinez's trial was that he was there at the time, and counsel's argument is that if those cell phone records had been turned over as they were required to be, that theory could not have been posited at the previous trial. Well, just to be clear in what we're describing as a theory, the government counsel did say that you could infer based upon the old cell site records, because there was a huge gap between the time of the murders before and after, that it could have been possible that the defendant was around the area. We know clearly that's not the case. But under either theory, because of what the overall theory of the government is in the case of Mr. Martinez's involvement, namely that he's the kingpin, the one who's ordering this murder, where he is in relationship to American performance was not a particularly big deal. He's the shot caller. The government was not alleging that he was the shooter. Now, obviously, if that was the allegation, and we can show that he wasn't there at the time of the murders, that's braided. That's a clear problem. But, counsel, it's quite clear that the government could not have made the argument that it did make had they had those records in evidence. Is that not true? That is true, Your Honor. It could have made a better argument, which is the argument that Judge Carter heard when he ruled that this evidence was not material, namely that the defendant was camped out at American performance. And this is why the evidence was helpful, and Judge Carter found the evidence was helpful, that 25 minutes before murders that the defendant had discussed in the telephone a mere hour and 40 minutes earlier, the defendant was at the scene there, clearly at that point in time able to be in walkie-talkie range with his co-conspirators, and then fled the scene, which fits in with all the other evidence that's presented regarding how this defendant operates. For instance, the Easter Sunday shooting with John Terzak. He's not the one who's going around shooting people. The defendant, he's a Mexican Mafia member. His soldiers, his associates are the ones who do that when he is safely at the side. The defendant was on parole, had served a lengthy time in prison for kidnapping. He wasn't about ready to be sitting around where a triple homicide occurred. So let me just bring it to the next point, which is the three things that have to be found for a Brady violation. And the United States Supreme Court in Strickler v. Green set out this test clearly, and I think that's the most helpful case for this Court because it sets out the standard. The evidence has to be favorable to defense, either because it's exculpatory or because it's impeaching. The evidence was not turned over by the government. We're conceding the second prong. And third, that it had to be material. And let me focus in on the materiality point because that's generally what the defense is talking about here. And I think that's the major flaw in the argument. And the flaw in the argument is that the government's whole case rested on Max Trevisco. That's not true at all. In fact, while Max Trevisco, I'm not denying the fact he was an important witness, he was the defendant's closest confidant. He was a Mexican Mafia member himself who flipped and testified against the defendant. But the star in the case, really, insofar as the Montebello murders were concerned and the other murders were concerned, were the wiretap calls. The 500 wiretap calls were played in the defendant's trial. So I'd like to go through a timeline of what happened on November 19th. And that timeline shows that, beyond a reasonable doubt, the defendant was the one who ordered these murders. And I would ask the Court to pay specific attention, as the jury was asked. And the jury was told, in closing argument as well, that, you know, Trevisco's testimony had to be supported. They were told that the jury had to pay specific attention to his involvement in this murder. So the jury had an opportunity to weigh his credibility and to weigh it against the other evidence in this case. And there's no indication that the jury didn't do anything but a most diligent job in doing that. And Judge Carter, of course, in the new trial hearing, heard all these arguments concerning the cell site records and their import. And, again, ruled that it was not material. We cited a Second Circuit case, Alano, which talks about how district court judges should be given great deference in cases like this, especially complex cases that last for months and months, like this one did here. Judge Carter heard three long cases, including two long cases, involving this. He understood and explained in detail in his rulings how these records fit into everything else. But let me go through the timeline. And if you'll notice, I'm only going to mention Max Trevisco because he was a participant in the wiretap calls. And this is no decoding involved here. This is just the facts. The facts show that at 3.38 p.m. on the afternoon of the murder, the murder occurs at 5.15, 3.38 p.m., 3.38 p.m., the defendant, who indisputably was a Mexican mafia member, called Max Trevisco. And he told him three things. First of all, he said a person whose name begins with R, he called him the one with the R, who they had been looking for, was being followed by Cuate. And the evidence was undisputed that Cuate was a member of Mr. Martinez's crew. So the one with the R is being followed by Cuate. Mr. Martinez asked Mr. Trevisco to get a crew ready in City Terrace to join in the hunt for the one with the R. He tells him that Gato and Sporty, two other members of his crew, Robert Marcato and Daniel Bravo, are on the move. And they're going to converge around where the one with the R lands. A minute later, there's an intercepted call. And that, by the way, is at the government excerpts of Record 1109-10. That telephone call. One minute later, there's a telephone call from Max Trevisco, where he carries out the defendant's orders. He called Marcel Arevalo, who indisputably was the leader of the City Terrace crew. And he tells him that Rich turned up. So we know who the one with the R is. It's Rich. Rich popped up in the neighborhood, and they got to get a crew ready to go after him. That's at GER 1112-14. Now, ladies and gentlemen, Your Honor, less than an hour and 40 minutes later, Gato, the one who was identified in the call from Martinez, was found less than a hundred yards away from the American Performance Auto Body Shop. And inside that shop, Richard Serrano, Rich, the one with the R, was dead, along with two other people. And Gato, the one who was going to converge around the area, the one who was going to go looking for the one with the R, is a hundred yards away. He has a loaded gun on him. He has a cell phone. And he has two walkie-talkies belonging to Martinez. So to say that the whole case rested on Trevisco is absurd, in light of those events. Calls that set up the murders, which describe what's going to happen, that Gato is going to be one of the people after him. And lo and behold, Gato, Mr. Marcato, is found a hundred yards away with the defendant's walkie-talkies on him, as well as a loaded gun. Which wasn't, but the gun didn't figure in it. That's correct, Your Honor. The gun did not figure. The government's theory was that Mr. Marcato was there to serve as a bodyguard. There was, of course, no other reasonable explanation for why he would be there. And it, of course, couldn't have been a giant coincidence that they're after the one with the R. Rich and one of his crew members, who identified as the one going after the one with the R, is a hundred yards away. And what the cell site records show is that at 4.49 p.m., approximately 25 minutes before the murder, the defendant is, in fact, in the area of American performance. And what he does then is flee shortly before the murders occur. Because, of course, he doesn't want to be around the scene when the murders happen. Counsel, what's your response to opposing counsel's position that it's not Well, no, he didn't live in the area of American performance, Your Honor. I don't believe that's what counsel is saying. I believe he lived in the area of El Hambra, where if you look in Atlantic, if you look on the cell site map, it's north. It's about five or six miles north. And where was his shop? The shop was located in Montebello. I can pass this chart off if you have any questions. I don't get it. Okay. The shop is on the X. And there's defendant's phone call there at 4.49, shortly before the murders. So in light of the facts that I've explained here, as Judge Carter ruled, the only reasonable inference is the inference or the conclusion that Judge Carter made. When you consider the case as a whole, as you must when determining materiality, the only reasonable inference is that the defendant ordered these murders, found a wiretap call ordering these  murders. But that's not the only inference that could be made, counsel, clearly. Well, that's correct, Your Honor. I think that's fair, obviously. But when you combine it with the other evidence in the case, you have the phone call setting up the murder, you have the defendant's crew member sitting there outside the slot of the murder with a loaded gun on him, and the defendant's walkie-talkies. Clearly, Judge Carter's conclusion regarding materiality is correct. Counsel, how long did the jury deliberate in this case? In this particular case? They deliberated for a considerable amount of time, Your Honor. I'm not exactly sure. I was not trial counsel in this case. But it was over a month. That's right. So you have to think that they had some doubts? Well, the jury had a lot to think about, for sure. There was several months of testimony involved here. There were 25 charges against the defendants. And they clearly did their job and thought about this extensively. But again, when you look at the wiretap records and the events that happened around that time period, these cell site records are helpful for the government and not hurtful, as Judge Carter ruled. Another thing about this case that is quite striking, and that is that much of the important evidence was in the unreported conversations. Well, the evidence concerning the Montebello murders, there were a series of unreported conversations between Mr. Torvisco and Mr. Martinez. That's correct. But if you go back to, for instance, the holding in Strickler v. Green, that's a case where a witness's credibility was destroyed entirely. I'm not saying that the cell site records do this for Mr. Torvisco at all here. But in that particular case, the Grady evidence that was turned over basically destroyed that witness. And the court said, nonetheless, when you look at the whole case, there still is not a reasonable probability that the case would have been looked into a different light so as to be left with a different verdict. And if I could talk for a second about Torvisco's testimony and the impeaching value of any of this. Obviously, we have the phone calls. And as much as defense wants to talk about code and everything else, it's pretty clear when you're talking about the one with the R, and you're talking about him as rich, in an and one of your crew members who's going to look for the one with the R, it's pretty clear what that phone call is about. And you really can't put any spin on that subject. But nonetheless, the cell site records, there are attempts to undermine Torvisco's testimony and impeach him. And even if that's the case, under Strickler, that's not enough. But it's not impeaching. Torvisco wasn't at the murders. What he testified to was merely what people reported to him after the murders occurred. He did testify that Torvisco or that Martinez gave orders over the walkie-talkie, according to the participants, to do these murders. And it's clear from the cell site records that there was a period of time where Martinez was in the area of American performance and could have given those orders over a walkie-talkie. But again, Torvisco's not there. He did not. And I don't know why it would be implausible for him to put a timeline on when this happened in relationship to when the murders occurred. He wasn't there. There's no evidence at all that anybody would have necessarily told him, let alone Mr. Macho Man Martinez saying, hey, you know what, I gave those orders and then I ran away. There's no reason to believe that that conversation would have occurred like that. So these cell site records don't directly undermine Torvisco's testimony. And as far as the ability to meet with Torvisco, this is one thing that wasn't raised with the district court, the meeting with Martinez beforehand. This wasn't expanded upon in any way. But it's simply not true that there wasn't an opportunity for a meeting. Whether it took place in city tariffs, obviously, because we have cell site records that show the defendant was there. But even if it took place in the Estrada Courts Project, which is a mere five minutes away from where city tariffs is, it's basically one of the adjacent cell sites. And again, the defense didn't develop this evidence, even though they had these records for a year before the motion for a new trial was heard. But there clearly was a possibility, since there was a gap in time between 4-13 and 4-28, for instance, for Martinez to have met with Torvisco and discussed what was going to happen. It wasn't a long meeting. He said, we're going to American Performance, and we're going to kill this guy. And that's exactly what they did. And so where were these records that were finally discovered and turned over? Your Honor, they were in the FBI basement in something called an A1 file. They were misfiled. As I explained to the court, this is inexcusable. And I don't debate that fact. But there were well over 50,000 pages of discovery in this matter. There were phone records from a lot of people here. So it's not excusable. I'm not trying to excuse it. And I can't. Well, you're kind of trying to, because of that, you're trying to turn us into a jury. Well, Judge Carter, you know, who sat through these trials, he didn't turn himself into a jury. I mean, obviously, there's a mistake, and there's not disclosed evidence. This was not intentional, obviously. But the fact is, I got on the case. I told them I wanted to review the raw phone data. And they found these records. We turned them over. I turned them over the day after they were discovered. So this wasn't intentional. Judge Carter, who sat through these trials, had the opportunity to look at these records and weigh them in materiality, sense under Brady, under all of the totality of the case, how these cell site records fit in, and made his conclusion that they weren't material, in fact, were helpful for the government. Since I have about four and a half minutes left, I'm going to very briefly address some of the defendant's comments. First of all, again, the fact, the expression, for Visco alone, is simply not true. And when the court reviews these wiretap calls and listens to them like, or Judge Carter actually sat there and listened to them over and over again, it's clear that that's not the case. The van, Romareo did identify the van as a Chevy van. But Raul Cruces, who was an auto mechanic also, who was next door, and his testimony is in the record as well, said that a Chevy van and a GMC Safari, which is like a The fact that the eyewitnesses to the crime were not shown photo spreads several months after the murders occurred, after the murders occurred, the best they could do is do a sketch of a guy in a hood. It looked like the Unabomber. There's no evidence that they would have been able to pick out anybody. Guys came into the shop, two guys came into the shop and started shooting at them. They didn't sit there and take notice of what was going on. They all ran for their lives. And three, unfortunately, were caught and killed in that shop that day. So these claims really have no merit when you look to the totality of the records in the case. And in addition, to point out the helpfulness of these records, which is another thing that Judge Carter found, not only did he place the defendant at the scene of the murders 25 minutes before they occur, but these records, the other thing that they did, was show that there was a phone call made by the defendant at 5.03, about 10 or 12 minutes before the murders, to Marcella Rupp, who was a shooter. Now, what an amazing coincidence that is. And of course, that bolsters Torvisco's testimony. Torvisco doesn't know about the phone records of his co-defendant. He doesn't know about cell site records. But yet, he says, Martinez, the person who dropped off the shooters was a Revelo. And lo and behold, less than 15 minutes, 10 or 12 minutes before the murders occur, the defendant is calling a Revelo. And the defendant is calling a Revelo from the cell site that's right next to where the shop is. So again, that's another example of how these records are helpful and not hurtful. In my remaining two and a half minutes, I want to address the last claim, and that's that these records somehow affect the whole trial. And the government, we submitted nine volumes of excerpts of record. The defendant, in their opening brief and pretty much in their reply brief, too, didn't really bother to talk at all about the other crimes that he was charged with. He started with 25 different crimes. And the majority of them, 14 of them, had either nothing to do with the Montebello murders at all, or were crimes like the Rico crime that had so many racketeering acts unrelated to the Montebello murders that they could stand on their own, regardless of what happened to the Montebello murder counts. Basically, if you were to excise those counts from the whole case, there would still be support for 14 out of the 25 verdicts. And first defendant's argument is that there's some sort of spillover. Well, the case, the Ninth Circuit in United States v. Gob, G-O-L-B, said that that was not the approach, or at least that was not the approach that was used in that case. The approach is the approach for Brady. You look at that evidence, and you see if it's material to these other counts. And obviously, Martinez's whereabouts on November 19th of 1998 aren't relevant to things like whether he participated in the Easter Sunday shooting of Terzak and his family, or whether he participated in racketeering acts like extortion. And there are about 100 wiretap calls that act clear in spades. There's not even, there can't even be a dispute of the fact the defendant was a Mexican mafia member, that he was organizing these neighborhoods, and that he was extorting drug dealers and gang members. That's not even, can't even be a claim here. In fact, and when we get to the Terzak murders, he doesn't claim he wasn't involved. In fact, he says this was his effort to strike back at Terzak. The majority of these other charges, the defense, for the defense, was a self-defense theory, which the jury rejected after hearing all this evidence. So the Montebello murder evidence has nothing to do with that. And again, as related, it didn't impeach Torvisco at all, but specifically didn't impeach his credibility as it relates to all these other counts. All these other counts were supported by testimony and wiretap calls that have nothing to do with these sell-side records, so they should all stand. And regarding the spillover analysis too, first of all, not an analysis adopted by this Court. Second, all the other crimes were serious as well, not just these murders. Third, the jury was instructed to consider each count separately. And lastly, the jury showed that they did, in fact, consider each of the counts separately because they acquitted the defendant on count 13, one of the counts. So despite the fact that there were these murders out there, the jury was able to distinguish that conduct from the conduct on count 13, give that separate consideration, and acquit the defendant. Well, what would his sentence have been if the Montebello crimes were excised? Your Honor, I'm not sure about that. I believe he's a career offender. It would be lengthy. Pardon? It would be lengthy. Yes. It would be lengthy. All right. Thank you, counsel. Thank you. Mr. Foddle. Thank you, Your Honor. I'm going to start off by repeating a suggestion that the government made, and that is for the Court to spend a considerable amount of time looking directly at the wiretap transcripts. They're in Volume 7 of our excerpts of record. They obviously have very different ways of looking at them. I think when you look at them, you're going to see that they're going to make no sense whatsoever unless you have Torbisco's testimony explaining them, and that's why Torbisco is the key witness here. If the Court reads it and believes, as the government thinks it will believe, that it can look purely at these foundations and are talking about killing Richard Serrano and going into American performance with guns blazing, then that may very well be what the Court decides. Why do you explain the reference to R and then to Rich or Rick? I've explained that it's not a very uncommon name, and that, again, given how the government described the daily activities of the Mexican mafia, violent acts were not unusual. Looking for people who they thought had done them wrong was not unusual, and it's just a coincidence. That's not an amazing coincidence. It's not such an amazing coincidence, and that's the other thing I'd like to point out during the remainder of my rebuttal time is government counsel, again, doing his best to distance himself from Max Torbisco because I think he has to, focused on these records and said, as much as Serrano was saying, as you look here, you've got the first call, it's all about R, and the next call is about Rich, and we're sending somebody over here and Gatto's over here, and lo and behold, Gatto is arrested right outside of American performance after the shootings. Clear as a bell, everything Torbisco said is true. Why did five other men get acquitted in that second trial who were the same evidence? Clearly it's not that strong. Mr. Gatto, his lawyer is here to deal with another issue, but he did not go down on those risks, and if the government's theory that the trail through the recorded conversations lead obviously to the fact that Robert Mercado was part of the conspiracy to take down the people in American performance that day, why wasn't he convicted? I think that's because the government's case isn't as strong as it suggests, and given that weakness, I think the new cell phone records, which the government changes its theory, requires a new trial be granted in this case. Thank you, counsel. Thank you to both counsel for a case well-briefed and well-argued. The case just argued is submitted for decision by the court. The next case on calendar for argument is United States versus Mercado Bravo.
judges: B. Fletcher, Canby, Rawlinson